Mr. Rafferty left his briefcase here. Not surprising. We'll find a way to get it back. Maybe it does at this point. Good morning, your honors, may it please the court. I'd like to begin my argument by discussing the second point that was addressed in the district court's opinion that we are appealing, namely the issue surrounding the construction of the not detecting language in claim five. As the court knows, the district court construed that phrase to mean that there can be no detection whatsoever of an interfering PTH fragment in the immunoassay method. Counsel, just so I understand, you would have to prevail both on the not detecting and your arguments related to specific four to overcome the summary judgment because it was two independent grounds. I agree. I have one other procedural question for you. I understand there's an interference at the board currently. Is it over or does it depend upon the construction of these specific terms? No, as we pointed out in our reply brief, that interference has been concluded. There's nothing that can happen in this case that can affect that proceeding and nothing in that proceeding that can affect this case. Okay, now of course you are arguing and disagreeing with the court's claim construction. You said the court's construction was alone because it said no detection and you said the correct construction was no significant, kind of insignificant. Yes, Your Honor. The court's construction would preclude any degree of detection at all. And we think that was an error. We think that immutopics is wrong when it argues that the court relied on intrinsic evidence to arrive at that construction. In fact, we think the court overlooked perhaps a very important piece of intrinsic evidence. What was the whole point of this invention? What were the goal and the purpose of this invention? Are you going to tell us how we know, how we should conclude that the project was wrong? Yes, I hope so. Your Honor, the problem that was addressed by the inventors of the 566 patent is set out in the background section of the patent in column two. The leading test for parathyroid hormone at the time was a test that was marketed by Nichols called the Allegra test or the IPTH test. The background section points out the problem with that test, which was that it could not discriminate between the active whole PTH molecule, the whole 1 through 84 amino acids, and a large, in-terminal, truncated fragment of it, which we've called 7 to 84. And that's pointed out, and the patent says that the problem is that that test would not discriminate between those two molecules. In the abstract of the patent, it states the present whole PTH assay can differentiate between the complete 1 to 84 amino acid sequence and a large but incomplete 7 to 84 form of PTH that is measured by the commercially available intact or IPTH assay. And figure five in the patent shows results of tests of patient's serum samples, demonstrating that the Nichols assay consistently produced higher results than the amino assay of the patent. It is this characteristic of the assay, the ability to differentiate whole PTH from this fragment, that should form the basis for interpreting the claim term not detected. The district court acknowledged that the goal of the patent was to succeed where the Nichols test had failed. And I would submit there's nothing in the patent, or in the prosecution history anywhere, that suggests that the complete absence of cross-reactivity is needed for an amino assay that can differentiate. There's nothing in the specification or prosecution history except that little language in the claim that says not detected. Well, that, and that of course is the argument that our opponents make. That is essentially their only argument. But as we pointed out in our brief... But it is a pretty good one because it's the claim language. Well, as we pointed out in our brief, this court has not hesitated to find that these sorts of terms are not construed in an absolute way, if there's a reason not to. And I would refer to the Buston Scientific versus Simon case, which had the claim limitation non-thrombogenic in connection with heart stents. And the court pointed out that, and this is a quote, stents are known to promote thrombosis, and the goal of invention is to have a claimed stent promote as little thrombosis as possible, or not to promote thrombosis at all. In the Paragon Solutions case, the court declined to construe the term real-time data in an absolute way that required instantaneous data. So why shouldn't the burden be on the claim drafter to be clear? If the claim drafter intends to have clinical significance be the parameter, why shouldn't the claim drafter have to say, you know, clinically significant detection? If the claim drafter instead says no detection, as a matter of public notice, what's wrong with holding the claim drafter to the choice of unmodified absolute legend? Your Honor, when we get to this phase of the proceedings, we often can think of ways that we might have written the claim differently. But the question is not how we would do that, but the question is what would this term in this claim have meant to a person of ordinary skill in the art, back at the time the invention was made. And the court has, as I said, on a number of occasions, have looked at terms like this and said, you know, we have to put some leeway in here because of the... In those other cases, counsel, like my recollection of the real-time case is that it wasn't technologically feasible. The notion of real-time isn't a realistic idea. So an ordinary skill in the art would appreciate that it couldn't be done in real-time, but there's always some ministerial delay as electrons move from one place to the other or whatever. So real-time wasn't meant to truly mean instantaneous. Whereas here, it's not the case that no detectable has to mean no clinically detectable, otherwise the claim itself doesn't operate, doesn't work. So that is our position, that it basically has to mean no detectability that would have any significance in a clinical setting. Was it technically possible at the time this claim... I'm sorry, sir. Was it technically possible at the time this claim was written to get down to a no detection level? The only evidence in this case on that... Well, the answer to your question is no. The only evidence in this case addressing that question is the testimony of the expert witnesses that was presented by scantibodies. And scantibodies presented testimony from Dr. Raines-Goldberg, who was an expert in immunology, and I'll simply quote what she said. An antibody is a biological molecule. It's not perfect. The binding characteristics are very sensitive to the circumstance in which the antibody finds itself. The kinds of solutions, alterations, salt concentrations, acids, bases, can influence the ability of the antibody to bind. And so in the field of immunology, we don't, even if the words are used, the understanding is that it is not an absolute. There are always shades of gray. That was her testimony. There has been no testimony in rebuttal to that. I don't really understand that as responding necessarily to Judge Plager's question or sort of my earlier question. I mean, the claim says having no detectable binding. And so the question here is all about, it seems to me, detectability. And it isn't the case that if at the time the technology was relatively imprecise, so while someone might not be able to find binding, that doesn't mean it's not necessarily prevalent. We use the technology at the time and say, under this technology, would you have detected this binding? Yes or no? And that seems to me to be the way that you would look at this. And that's why I'm finding the insertion of the clinical language strange. Well, I think there are two points. I think what, if I may just interrupt, there are two points. I think what Judge Moore is pointing to is that your answer supports the other side because it suggests that at the time the claim was drafted, they understood that no detection meant no detection by those standards. No detection that would have any significance to the use of the assay for the goal and purpose for which it was developed. That is really the point. We get these cases, counsel, and sometimes the parties fight over this because what ends up happening is the standard is, you know, patents are filed when things are new, and usually, like, the detectability is really very rough. It's not precise and fine. And then, of course, so when they say something is not detectable, then the technology becomes more precise and better, and later on they find out, yes, it is, in fact, detectable. And we always say you apply that standard as it exists at the time that the patent was filed. Well, I think that's happened here to some extent because the argument that our opponents make is that they refer to the commercial assay that Scantabody's developed. They refer to a publication by scientists two years after the patent application was filed, both of which indicate there is a lower level of detectability that is achievable. But the only evidence in the record is Dr. Raines Goldberg's testimony and the testimony of inventor Cantor in which he said immunoassay science in general has not evolved to the point of being able to measure the construction of an analyte in blood serum with absolute precision. And so I think we have two points. We have what was the state of the technology at the time, and the court has only this evidence in the record on this point. But the other point is would a person skilled in the immunoassay technology have construed this term, would have read this term as requiring no detectability whatsoever? And we submit that it would not. That it really makes very little difference to the value of a commercial assay or whether a commercial assay achieves the goals that were set out in the patent application, whether there is some low level of detectability. It's essentially noise. It doesn't matter. And, you know, the claim would certainly cover something that had absolutely no cross-reactivity, but the question here is should it be limited to that? And a person of skill in the art, as Dr. Raines Goldberg testified, would not have interpreted it as requiring that level of the absence of cross-reactivity. Are you saying, in effect, that because the immunologists whose testimony was before the court testified in there, and Dr. Raines Goldberg testified as they did, and there was no contrary testimony, that you're entitled to win on the claim construction dispute because you had expert testimony on your side and there was no conflicting testimony welcomed by the other side? I guess what I'm saying, Your Honor, is that this issue goes to two things. It goes to what were the capabilities of the technology at the time of the invention and also how would a person of ordinary skill in the art have understood the language of the claim as a scientist? And those are topics which judges don't have personal knowledge of. Those are topics that judges have to look to experts to answer. And this court, while I understand the limitations that this court has put on the use of extrinsic evidence, the court has quite consistently said explaining the technology and explaining what people of ordinary skill in the art understood at the time is a proper function for an expert witness. And that's precisely what these expert witnesses were doing. So, yes, I think the fact that it was not rebutted, that there is no contrary evidence in the record, should be a significant point for the court to consider. Why do you think Judge Gelser rejects the opinion of this court? Well, I guess I won't say what I think is in her mind because I don't know what was in her mind. What she said was, yeah, what she said in her opinion was that she went to the scientific literature and did her own literature research and she came up with what she felt was a proper definition of measurable affinity or measurable binding. The error in that analysis... Textbook for what year? It was prior to the patent. But let me try to explain what I think happened there. It's pretty clear if you read the opinion on this point that what the district court judge did was she looked at the claim language and said that means no detectability whatsoever. And then she went to the scientific literature to find a way of expressing that in scientific terms. And she found a textbook which said that antibodies have association constants ranging from 10 to the 5th to 10 to the 14th. But 10 to the 5th is virtually meaningless. The level of binding is so low as to have no meaning whatsoever. And she said, so that's what I mean by no measurable affinity. So the point here is she was starting with a preconceived notion as to what this term meant. And then she found a scientific explanation or a scientific way of expressing that. You could say she was starting with the language of the claim. Well, she didn't start... This court has said on numerous occasions that the language of the claim has to be read through the eyes of a person of ordinary skill in the art at the time. And she did not start with that perspective. I have about a minute. I'd like to just say one thing about the Specific Four issue, if I may. The parties agree or at least say they agree on the court's construction of Specific Four. The issue there is whether... The application of it. Is the application of it. Is the application of it. And the immutopic people say they agree with the judge's construction, but then spend most of their argument, most of their brief, arguing that the antibody has to bind to an epitope wholly within that initial peptide sequence, which is contrary to the language of the judge's construction. And it's actually contrary to the language of the claim, which says those four amino acids have to be part of. We referred to figure two of the patent, which illustrates an antibody that spans the initial peptide sequence, but also spans some additional amino acids. It looks like it goes from one up to about 10. And so this represents an embodiment of the invention, and it rather graphically demonstrates that the antibody is not required to bind only to that initial sequence. Immutopics responded by saying this is not quantitative. It's not drawn to scale. This should not be considered part of the written description. Well, we disagreed with that. And for reasons that are said in our brief. But the point I would like to make is the fact that these drawings are intended to indicate where the antibody may bind is further highlighted or illustrated by figure six. Figure six uses the same style of drawing, but what it does is it shifts the binding region of the antibody in the C-terminal direction so that it no longer now binds to the initial peptide sequence. So it's clear that the patentee here was using this to illustrate where these antibodies could bind. And figure six, I was referring to figure 6A. Figure 6B then shows that that antibody will bind to the 7 to 84 interfering fragment. So I think this just corroborates that figure two actually does illustrate an embodiment of the invention. It actually does indicate what the potential binding can be. If there are any more questions, I'd be happy to respond, or I'll reserve the rest of my time. Your time has expired, but we'll restore your time. Oh, it says I have four and a half minutes. On the other side. I've used his time? I'm sorry. It's all right. You'll get it. And he's not going to thank you that we take that time away from him either. May I please report while we're to begin? With respect to the not-detecting argument, as for the argument that the not-detecting limitation means no binding whatsoever, that's absolutely incorrect. The claim term was defined as having no detectable binding to an interfering non-1 to 84 parathyroid hormone fragment. And it occurs at levels indicative of nonspecific binding. And that cutoff is 10 to the fifth liter per mole. That's the association constant at the lower limit of useful antibody binding as supported by the literature. It is not no binding whatsoever. This level, the 10 to the fifth liter per mole threshold, is the same level that is indicative of specific binding that the parties agreed to in connection with the specific four limitation. This is a distortion of the district court's ruling. Does this case turn at all on whether or not the means for detection have improved such that if you're using old technology, you would have no detectable binding, but with new, much more precise technology, suddenly there is resistance? Actually, the prior art technology did just as good a job. In fact, the Colford reference that was cited during the re-examination, if you compare that reference, if you look at the appendix, 3382, and compare that with the Gao article, which is relied upon, at 4711, they did the exact same thing. They were able to detect one immunoreactive peak, and it was understood and set forth in Judge Falzer's opinion that the Colford reference was able to discriminate whole PTH from fragments. It was able to do this. Now, we're saying some level of detection, that's not supported anywhere in the record, and if it were, you can't reconcile that interpretation with the Colford reference. In fact, it's worth noting that not detecting limitation was added during prosecution, and as a result, the plain and clear meaning of that limitation is no binding. I have a question. What does it matter whether the disputed phrase is in the claims originally drafted or as amended, in terms of whether we have to read it in absolute literalistic fashion? Per the Supreme Court's ruling in Festo, they make the argument that- Festo is a document of equivalence case? But it's cited for the proposition of subject matter that's been disavowed, and it's very pertinent to this case. It goes to the subject matter. Their claim was this big. We narrowed it to this. This is not a Festo case? If I could quote from Festo? Because in the reply brief- You can quote from Massachusetts versus U.S. from an earlier argument, but if it's not applicable, I don't know why you want to quote it. I'll make the point. Because they talk about this at length in their reply, pages 15 to 17 and 29 to 30, that the amendment, that limitation was made to overcome a 112 rejection, and it didn't have any narrowing effect. And they're saying if it were inserted to overcome a prior art reference, it would be a different story. But it was done just to make the claim a little more clear. But that's what misses the point. To quote Festo, if a patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with 112. But that's all in the case of prosecution history, estoppel not allowing the doctrine of equivalence to expand the scope of the claim. When you're talking about the literal scope of a claim, as Judge Plager suggested, it seems to me our precedent says there has to be a clear disavowal of claim scope. And that to me is arguably a different standard than what applies in Festo. There is a parallel rule, but it requires different performance, doesn't it? Well, as I view, I mean, in terms of the distinction made between the cases that allow for some wiggle room, saying not detecting really doesn't mean not detecting. In the cases that were cited, we point to footnote 48 of our reply to address all the cases, because I think they can be distinguished from this case. But by inserting the not detecting... I don't understand anything you just said. Here's one a little faster. My brain is a little slow today, so back up a little bit. So isn't there a different standard that applies to prosecution history, estoppel to apply, and for claim disavowal, which requires clear disavowal? So aren't those two different standards? Well, I'm saying that the disavowal, by virtue of adding this amendment, clearly states because the claim before was detecting PTH, and then it was amended to say not detecting interfering non-1 to 84 PTH fragments. So having been able to detect some... So you're willing to address our applicable standard by arguing that this was a clear disavowal? Yes, Your Honor. And they need... Well, I'm sorry. Did I hear the question? Under our cases. No, that's okay. I'm just puzzling how clear that disavowal was. Well, I mean, when you leave it blank and you add not detecting, it's clear that your claim language has to not detect. But the way the district court interpreted the claim, it uses this threshold for specific binding that the parties agree to in connection with the specific for application. So it's not... Well, it has to not detect something, but that's the problem with this disavowal argument. They say it has to not detect clinically, you know, to a clinically significant level, and you say it has to not detect to the 10 to the 5th moles per liter. Well, that's the... That seems to be the heart of the dispute, and I just don't see how adding this during prosecution amounts to a clear disavowal that should result in your interpretation prevailing over theirs. I don't understand how the prosecution history helps you on that point. Well, I'm merely making the point that the claims were narrowed, and we have a determination from the court... But they agree the claims were narrowed, don't they? I mean, they agree that now not detecting... It actually does mean something. I don't understand them to be arguing it is an irrelevant or inapplicable determination. Because when you come to differentiate the prior art references, as they did in reexamination, and again, I'll point to the Colford reference, because that was able to distinguish whole fragments from interfering fragments in a clinical sample. And it was the ability of the antibody, and the same for Kono as well, but it was the fact that these were not able to... The not detecting limitation is what was the point of novelty that was able to distinguish the prior art, and Colford in particular. Well, but that's not the rejection they were facing or the reason that they gave for their amendment. So you might say they had to make this amendment, or they never would have survived prosecution, but that wasn't the reason they actually articulated for this amendment or the rejection they were facing at the time. They mentioned it in reexamination. Yes, they mentioned they were relying upon the not detecting limitation to distinguish the claimed invention from the combination of the Kono and Bullion references. So that limitation was relied upon to distinguish the claimed invention. Do you want to hit the specific four? Sure, absolutely. Yeah, for the specific four limitation, the parties have agreed to accept the district court's construction of the specific four limitation, and the court has expressly said that the claimed antibodies may not bind to an epitope outside of the two to eight PTH sequence. They said that in their claim construction order, the appendix at 42. And the court also said that an antibody specific for a peptide sequence other than or in addition to the residues of two to eight were not within the specific four limitation of the 566 patent. That was said in the revised order granting summary judgment, and that's in the record at 875. The argument that scan antibodies relies on figure two is completely inappropriate. You cannot rely upon drawings if there's no support in the specification. Those are molecules. They're not drawn to scale. And for the authority that we cited in footnote 23 on page 25 of our reply, including the GoMed case, you cannot rely upon that. That this court's precedent is very clear on that point. And also, because they're referring to the figure, how the antibody goes, it sticks over to one to nine a little bit and saying, there we go, there's our disclosure. But that's not supported in the record. In fact, as you will, reviewing the materials in the prosecution history and reexamination, they sought to amend figure five to make reference to a one to nine antibody. That was rejected. Well, you can't rely. Because if I understand correctly, Your Honor, they're coming in here saying, look at these figures. These support the fact that our patent allows an antibody to extend or to bind to a region outside of two to eight. And I'm saying the precedent of this court does not allow that. I would say the GoMed case. Just because the figure isn't going to scale. It showed the correct relationship between certain peptides and the antibody without things going to scale. I'm not arguing about figure five. Your point is, well, as to those three designated figures, zero value because they aren't going to scale. And I'm challenging that by saying, I can imagine that they could be accurate in terms of the spatial relationship between the antibody and certain peptides, even though it's not going to scale. And your response is, well, your case law doesn't allow that. I don't understand how our case law blocks that. In terms of allowing for a broader interpretation of their antibody to bind outside the two to eight, Duke, is that your question, Your Honor? No, my question is, how do you think any of our holdings prevent us from giving any weight to figures six, A, and B? Then, for the record that's before this court, I would cite to the party's interference ruling, which basically said there was no support in their continuation, in part, which incorporated, by reference, the parent application for anything other than a one to eight antibody. That's now a final judgment at this point. And that was discussed at some point. No, Your Honor. But if you look at, actually, three aspects of the case, we are agreeing to the judge's construction of the specific poor limitation. And the claim construction order says you cannot bind outside the two to eight sequence. And then we have the reexamination of the 566 patent, where it was sought to be amended to include reference to a broader antibody outside of one to eight. That was rejected, and scantibodies acquiesced to it. It binds them. Yes, it does. I could probably find that authority for you. I wouldn't say the Litton case. In response to a final office action, the patentee acquiesced to changes set forth in the final office action. And then they later went on to litigate to basically take a position. I'm going off memory here, and I can quote it here. They're bound by that decision that they made, the representations they made before the patent office. Possibly inconsistent with what they argued or took a position on in the patent. Maybe there should be some rule. Maybe there's logic to that. But I am not aware of any case that's so whole. And you said, well, there is. And I thought you mentioned Litton. And then I asked you, what in Litton blocks them from taking a different position here? And you didn't really respond. So if you have a response, please give it to me. If I understand the judge's question, is whether or not the authority that says decisions made in prosecution are binding in later litigation regarding the scope of a claim? Is that correct, Your Honor?  It's inconsistent with that. So then I asked you, what case of our court holds that such an estoppel automatically and invariably and completely arises? You said Litton. What is Litton? And you didn't answer. I'm sorry. Thank you, Your Honor. Just quickly on that last point. Aside from the legal infirmities of the argument, there was nothing inconsistent. What is being addressed in both the prosecution of this case and the prosecution in the interference was a process claim. Whether you use a 1 to 9 or a 1 to 8 peptide in the immunity affinity process for extracting these antibodies. This method of immunoassay claim has no process limitations in it. This has nothing to do with the binding to the 2 to 8 region. On the prosecution history, on the not detecting point, Mr. Newbols has his argument as to what he thinks the Colford reference teaches. And I think it would be fair to say he thinks it teaches this invention. But that's really not the issue before the court today. That's an issue for obviousness or invalidity. The question here is whether the arguments that the patent owner made during reexamination to address that reference amounted to a clear and unmistakable disavowal of claim scope. If you read that argument about Colford and Kono and the other references that were cited, there were two arguments made. One argument was this claim requires at least four amino acids in that initial sequence. There's nothing in those references that tells you that the antibodies that those references describe bound to four amino acids. It was well known that an antibody could bind to an epitope with as few as three amino acids. That was one argument. That didn't disclaim anything. The second argument was that the Colford reference was not able to discriminate between whole PTH and 7 to 84 PTH any better than the Nichols test could. And they referred to a Jensen publication on which Colford was a co-author and test results in there which they said showed, the prosecutors said, showed there was no difference between the ability to discriminate. Now, whether those arguments were right or wrong is not the issue for this, respectfully, for this court. The issue is whether those arguments amounted to a disavowal and they did not. All of which only goes to one of the two issues, isn't that right? This whole discussion about the disavowal only goes to the second issue that's at stake in this thing. The not detecting, correct. Yeah. Yes. Okay. Yeah, that's right. The, I'd like to just, Mr. Newbles and I have a disagreement as to what the judge's construction of this not detecting actually was. And we certainly read it as precluding any measurable detection whatsoever. And quite frankly, I don't think the judge's opinion is clear on whether the 10 to the 5th association constant is part of that construction or not. She didn't look at association constants for anybody's antibodies in making any decisions in this case. But even if it is, what she said about that 10 to the 5th liter per mole association constant is that it is such a low level that it is indicative of nonspecific binding and difficult to measure and probably of little biological importance. So I don't think there is, even if the 10 to the 5th metric is part of that construction. And I don't know if it was or not. It's no different from saying there is no binding. All right. Thank you. Thank you very much.